## ABENDSCHEIN *v.* FARRELL.

### LIPSITZ *v.* SAME.

#### Opinion of the Court.

1. COURTS—OVERRULING OF PRECEDENTS—SUPREME COURT.

    Overruling of precedential case law as to choice of laws, originally decided by the Supreme Court, must be done by the Supreme Court.

2. NEGLIGENCE—CHOICE OF LAW—LEX LOCI DELICTI.

    The policy of automatic application of the rule that the law of the place of injury determines the existence of a cause of action in negligence and all of its incidents should be re-examined in light of the fact that the uniformity of result which was the reason for the existence of the rule is no longer an important objective, since many jurisdictions now depart from its strict application to choice-of-law questions, applying, instead, the law of the place of most significant relationship.

3. SAME—GUEST PASSENGER—CREATION OF RELATIONSHIP.

    The law of New York should govern a cause of action in automobile negligence by a passenger against his driver arising out of an accident in Ontario where the host-guest passenger relationship was formed in New York and plaintiff-passengers were New York residents, and where Ontario has no genuine interest in whether a New York passenger can recover for the wrongful act of a Michigan host-driver driving a Michigan vehicle.

4. AUTOMOBILES—NEGLIGENCE—GROSS NEGLIGENCE—CHOICE OF LAW.

    Whether conduct of host-driver constituted negligence or gross negligence is to be determined by the law of the place where the negligence occurred.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 5] 20 Am Jur 2d, Courts § 231.
[2] 16 Am Jur 2d, Conflict of Laws §§ 71, 73.
[3, 4, 7] 8 Am Jur 2d, Automobiles and Highway Traffic § 466.
[6] 4 Am Jur 2d, Appeal and Error § 309.

DISSENTING OPINION.

LEVIN, J.

5. APPEAL AND ERROR—REVIEWING FUNCTION OF COURT OF APPEALS.
    *Court of Appeals is not bound to await decision of Supreme
    Court overruling outmoded rule of law that the law of the
    place of injury governs all incidents of a cause of action in
    negligence; if Court of Appeals is convinced by overwhelming
    repudiation of strict application of the rule in other jurisdic-
    tions that were it passing on question today the Supreme Court
    would adopt another approach to the choice of law problem,
    then its duty is to follow the rule it believes the Supreme
    Court would adopt.*

6. SAME—LEAVE TO APPEAL—DENIAL OF LEAVE.
    *The Supreme Court may decline to grant leave to appeal from
    the Court of Appeals for reasons unconnected with its view of
    the meritorious question presented by the appeal.*

7. NEGLIGENCE—GUEST PASSENGER—CHOICE OF LAW—NEW YORK—
MICHIGAN.
    *Record in summary judgment by lower court provides insufficient
    basis for decision whether the interests of Michigan in apply-
    ing its automobile guest statute to an Ontario accident out-
    weigh those of New York in protecting guest passengers, or
    whether Michigan statute is not intended to apply extraterri-
    torially, in which case the Michigan common law of the lia-
    bility of a host to his guest passenger might be found to be
    identical to that of New York, thus eliminating the choice-of-
    law question.*

Appeal from Wayne, Neuenfelt (Lila M.), J.
Submitted Division 1 November 8, 1967, at Detroit.
(Docket No. 3,393.)   Decided June 20, 1968.   Leave
to appeal granted September 30, 1968.   See 381 Mich
780.

Complaint by Earl Abendschein, for himself, as
executor of the estate of Leona Abendschein, de-
ceased, and as guardian of Darrell Abendschein, a
minor, and by Paul Kanter, as guardian of Penny
Lipsitz, a minor, against Robert Farrell and Dietrich
Leasing Incorporated, a Michigan corporation, for

damage for wrongful death and personal injuries in an automobile accident. Judgment for defendants. Plaintiffs appeal. Affirmed.

*Charfoos & Charfoos,* for plaintiffs.

*Alexander, Buchanan & Conklin,* for defendants.

J. H. GILLIS, J. Defendant Robert Farrell, a Michigan resident, was the driver of a Michigan-licensed automobile which went out of control and rolled over a number of times while proceeding west on highway 401 in the Province of Ontario, Canada. Defendant Dietrich Leasing, Incorporated, is a Michigan corporation with its principal place of business in Wayne county. Dietrich was the owner of the automobile being driven by Farrell.

At the time of the misfortune in Ontario, Farrell was en route from Buffalo, New York, to Detroit, his most direct route taking him through Ontario. There were 3 passengers in Farrell's automobile, all of whom were New York residents: Leona Abendschein, Darrell Abendschein and Penny Lipsitz. Leona was killed in the crash. Darrell, 12 years old, and Penny, 19 years old, were severely injured.

Plaintiff Earl Abendschein was the husband of Leona and is the personal representative of her estate. He also sues as guardian of Darrell. Plaintiff Paul Kanter is guardian for Penny. Appointments were made and letters were issued by the New York courts.

Plaintiffs brought this action in the circuit court for Wayne county alleging that defendant Farrell operated the automobile in a grossly negligent manner with reckless and intentional disregard of his own safety and that of his passengers and was guilty of wanton and wilful misconduct. In particu-

lar, it is alleged that Farrell consumed excessive amounts of alcohol both while driving and before driving with a conscious indifference to the safety of his passengers. Plaintiffs plead that Farrell drove his automobile at an excessive rate of speed (90 miles per hour around curves) over the protestations of his passengers, and refused to slow down on their demands.

Defendants moved for summary judgment in the trial court for plaintiffs' failure to state a claim upon which relief can be granted (GCR 1963, 117.2[1]). The motion urged that the issue of defendants' liability must be governed by the law of Ontario, the place of the wrong. Ontario statutes (Ont Rev Stat c 172, § 105[2][1960]) deny recovery to a gratuitous passenger who is injured as a result of the negligence or gross negligence of the host-driver. No allegation is made that this was not a gratuitous guest-passenger relationship within the meaning of the Ontario statute.

Plaintiffs argued in the trial court, as they contend on this appeal, that Ontario law should not govern the issue of liability of a host-driver to his guest-passenger. New York allows recovery against the host for ordinary negligence (*Babcock* v. *Jackson* [1963], 12 NY2d 473 [240 NYS2d 743, 191 NE2d 279, 95 ALR2d 1]), and Michigan allows recovery for injuries sustained due to the driver's gross negligence or wilful and wanton misconduct, CLS 1961, § 257.401 (Stat Ann 1960 Rev § 9.2101). Under the law of either New York or Michigan, plaintiffs have stated a good cause of action.

The trial judge granted the motion for summary judgment on the authority of *Kaiser* v. *North* (1939), 292 Mich 49, and dismissed the action. To be sure, *Kaiser,* decided some 29 years ago, does appear to

be on all fours with the present case, and to compel the result reached by the trial court.

In *Kaiser,* two Michigan residents were driving in Ontario where their automobile was involved in an accident. The Supreme Court affirmed the summary dismissal holding first, that the law of the place of the wrong governs (the *lex loci delicti*) and second, that the Ontario statute did not contravene the public policy of the State of Michigan. This precise issue of what law governs the host's responsibility to his guest has not been questioned since 1939.[1] In *Goldberg* v. *Koppy Tool & Die Co.* (1962), 365 Mich 469, the Court spoke in terms of law governing the guest-passenger relationship but in actuality had before it only the question of whether defendant was negligent under the law of Tennessee. The Court did apply Tennessee law to the duty owed the passenger by her host, but a careful reading will disclose that the choice-of-laws problem was not raised or decided.

Thus in innumerable cases the Court has said that matters relating to the existence of a right of action, that is whether a cause of action exists, are governed by the law of the place of the wrong, but, as in *Goldberg,* only decided that the issue of negligence is determined by law of the place of the wrong. *Leebove* v. *Rovin* (1961), 363 Mich 569; *Blake* v. *Brama* (1955), 343 Mich 27; *Slayton* v. *Boesch* (1946), 315 Mich 1. In other cases, the Court was deciding the applicable law governing substantive rights in a suit brought under a foreign statute, *Summar* v. *Besser Manufacturing Co.* (1945), 310 Mich 347; *Howard*

---

[1] Some of the Michigan authority, much of it referring to the *Kaiser* decision, would appear to rule on principles broader than those actually before the Court. Language has plagued this area of the law especially when courts have spoken in terms of "right" or "remedy." An illustration of this language problem is pointed out by the concurring opinion to *Browning* v. *Shackelford* (1967, Miss), 196 So 2d 365, 373.

v. *Pulver* (1951), 329 Mich 415; *Yount* v. *National Bank of Jackson* (1950), 327 Mich 342.

In *Bostrom* v. *Jennings* (1949), 326 Mich 146, the Court held that the law of the place of the wrong governed the question of whether plaintiff-passenger was a joint adventurer with the driver-host. A careful reading of this case will reveal that the choice-of-laws problem was not decided. The question the Court had before it already assumed the applicability of foreign substantive law, and the Court decided whether the relationship was a matter of substance or procedure under local law.

Reviewing the post-*Kaiser* Michigan authority, we find that the only cases in which the Court was called upon to make a choice of conflicting substantive law were those in which the foreign standard of conduct was applied to a Michigan suit. That is, we are firmly committed to the notion that the substantive wrong being sued upon and the sufficiency of the alleged facts constituting that wrong must be governed by the law of the place of the wrong. While other cases recite a broad rule of governing laws, they were mere recitals and were not necessary to resolution of any choice of conflicting laws.

The case of *Kaiser* v. *North* itself does specifically decide a conflicting choice-of-laws problem. Its holding cannot be distinguished from the pertinent issue in the present case; that is, that the law of the place of the wrong governs the rights and duties between nonresident hosts and passengers, who fortuitously happened to be in the state wherein the accident occurred. Plaintiffs do not attempt to distinguish the present case, and ask this Court to merely criticize the rule of *Kaiser* as presently being out of step with other jurisdictions. If *Kaiser* is to be overruled, to be sure that is the function of the Supreme Court.

*Kaiser* is not based on any authority which remains viable today, and, although the operative facts in the present case are indistinguishable from *Kaiser,* the policy facts on which that decision rested have changed radically in the intervening years— so much so that one might question whether we are even deciding the same problems raised by the *Kaiser* situation. *Kaiser's* emphasis on comity might lend support to the argument that that case no longer stands as authority.

*Kaiser* and the Michigan decisions predating that case reveal that our Courts have never expressed an independent analysis or reason for the rule therein stated. *Lex loci delicti* was the universal rule among the jurisdictions and universality of application made the rule not only desirable in terms of predictability, but almost automatic as well, with no alternative rules being presented to the courts. The authority referred to in *Kaiser* included Restatement of the Law, Conflicts, § 388; 15 CJS, Conflict of Laws, §§ 4, 12, pp 865, 899; Beale on Conflicts, § 378.4; Goodrich on Conflicts (1st ed) § 92, p 188; and the only Michigan case cited as authority was *Eskovitz* v. *Berger* (1936), 276 Mich 536.

*Eskovitz* v. *Berger* is well illustrative of the point that the *lex loci delicti* rule had simply come to be accepted in Michigan, apparently because it was, at that time, the general if not the only rule available. In *Eskovitz* two Michigan residents were injured in an automobile accident which occurred in the State of Ohio. Ohio allowed recovery by a guest passenger on a showing of ordinary negligence. The Ohio statute was held to govern in the Michigan lawsuit.

Although the language of the *Eskovitz* opinion is phrased in all-encompassing, sweeping choice-of-laws language ("all matters relating to the right of action are governed by the laws of Ohio," 276 Mich

536, 540) the decision did not deal with a choice-of-laws question. Even by the time *Eskovitz* was decided, the doctrine of *lex loci delicti* was being automatically applied in this State. It is noteworthy that defendant's brief in *Eskovitz* did not even raise the choice-of-laws question.[2] So automatic was the application of the law of the place of the wrong that defendant's only issues on appeal were whether application of Ohio law contravened the public policy of Michigan and whether defendant was negligent under Ohio law.

Through the unfortunate use of the broad language as pointed out above, *Eskovitz* has come to be cited as something of a leading case in this State on choice of applicable laws governing tort actions. Thus in the *Kaiser Case,* the unfortunate misapplication of *Eskovitz* formed a questionable foundation for the decision.

There were other cases besides *Eskovitz* which were decided prior to *Kaiser,* but like *Eskovitz* did not actually decide the issue before the Court in *Kaiser.* Why *Eskovitz* was chosen as authority is by now a historical curiosity—other cases were only beside the point but *Eskovitz* was unfortunate dictum. Of these pre-*Kaiser* decisions, the bulk deal with the law applicable to the standard of conduct or the substantive elements of the tort. It was universally accepted and would not be seriously disputed today that the measure of conduct is determined by the law of the place of the wrong, *Stahl* v. *Bell* (1936), 276 Mich 37; *Meyer* v. *Weimaster* (1936), 278 Mich 370; *Edison* v. *Keene* (1933), 262 Mich 611; and in *Perkins* v. *Great Central Transport Corp.* (1933), 262 Mich 616, a similar decision

[2] Supreme Court Records and Briefs, April Term, 1936, Docket No. 23.

was dictum since foreign and local law on contributory negligence were the same.

In *Hazard* v. *Great Central Transport Corp.* (1935), 270 Mich 60, the Court did employ some language which might indicate a choice of laws for governing legal incidents of relationships having had some contact with Michigan. Again, however, this language was dictum, and the dispositive issue on appeal was whether the jury's verdict was supported by the evidence. In its dictum the decision cites the case of *Young* v. *Masci* (1933), 289 US 253 (53 S Ct 599, 77 L Ed 1158, 88 ALR 170), which merely decided whether New York could constitutionally apply its ownership statute to a New Jersey bailor of an automobile involved in an accident in New York. *Young* supports a broader multistate legislative jurisdiction—a wider choice of applicable laws rather than a narrow choice of laws formula.

In two early and "venerable" cases the Michigan Supreme Court applied Canadian law to injuries occurring in Canada. On the facts, however, they are distinguishable from the case at bar and from *Kaiser,* and were not cited in the *Kaiser Case.* In *Wingert* v. *Wayne Circuit Judge* (1894), 101 Mich 395, plaintiff's decedent drowned in Canadian waters allegedly due to defendant's negligence in Canada. Michigan had nothing to do with the relationship, the accident, or the injury and understandably, the Court held the Michigan statute inapplicable. It is doubtful whether a different conclusion could have been reached. See *Home Insurance Company* v. *Dick* (1930), 281 US 397 (50 S Ct 338, 74 L Ed 926, 74 ALR 701). The second of these early cases is *Turner* v. *St. Clair Tunnel Co.* (1897), 111 Mich 578 (36 LRA 134). A workman on the tunnel was injured when he was working on the Canadian side. It was held that whether the actions of his super-

visor were negligent in failing to supervise properly was a question under Canadian law. Again, the conduct is measured by the law of the place of the wrong.

We have indulged this extensive review of Michigan authority to point out that *Kaiser* is the only decision in Michigan to decide the question of what law governs the legal incidents (the standard of care or duty owed) of a relationship having contact with more than one jurisdiction. *Kaiser* stands alone with no Michigan authority before or after its decision coming to its support. The decision itself does not purport to be making law but merely to be following established rules. Those rules are not only unsettled today, but are contrary to the modern trend of decisions. If this is so, if the very foundation facts on which *Kaiser* rests are no longer existent, then we cannot see why *Kaiser* should be held to control a new set of foundation facts.

The citation of Beale on Conflicts (§ 378.4) in *Kaiser* did express the prevailing *lex loci delicti* rule of the day. Professor Beale's work was printed in 1935 and the author was also the reporter for the American Law Institute's Restatement of the Conflict of Laws (section 388 of the Restatement was cited in *Kaiser*). Beale's work would no longer be acceptable to the American Law Institute whose proposed Restatement 2d expressly repudiates the original view and that partially relied upon in *Kaiser*. See Restatement of the Law 2d, Conflict of Laws, Proposed Official Draft (May 1, 1968), §§ 145,[3] 146[4] and following comments and reporter's notes.

---

[3] "(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, as to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

"(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

The reference to Goodrich on Conflicts (1st ed) no doubt supported the proposition that *lex loci delicti* governs as to all matters relative to the right. The 4th edition (Scoles, 1964) of Goodrich on Conflicts dramatizes the evolution of choice-of-laws concepts over the intervening years, and this later edition of the work no longer supports a mechanical application of *lex loci delicti* to all aspects of the multistate tort case. See section 92 (p 165) *et seq.*:

"Frank recognition that the law by which the forum is guided in determining the issues in tort cases is that of the state which is most significantly related to the issue will avoid the mechanistic results that have characterized this area in the past. Courts will be required to make and perhaps to articulate pertinent policy considerations that will enable our common-law rules to develop commensurate with the growing complexity of multistate torts." (*Id,* section 92 at pp 166, 167.)

The citation to 12 CJ, Conflict of Laws, § 35, p 452, and 15 CJS, Conflict of Laws (now obsolete), §§ 4, 12, pp 865, 899, did reflect the general view as it existed in 1939, the publication date of the later volume. The view expressed in Corpus Juris, however, as we shall point out, is but the collection of prevail-

---

"(a) the place where the injury occurred,
"(b) the place where the conduct causing the injury occurred,
"(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
"(d) the place where the relationship, if any, between the parties is centered.
"These contacts are to be evaluated according to their relative importance with respect to the particular issue."
4 "In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied."

ing views amongst the jurisdictions which has drastically and dramatically changed in recent years.

The *Kaiser* decision further cites the case of *American Banana Co.* v. *United Fruit Co.* (1909), 213 US 347 (29 S Ct 511, 53 L Ed 826), for the proposition that: "the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." To be sure, we agree that whether or not activities in a foreign jurisdiction constitute a substantive wrong should be governed by the laws of that jurisdiction. That is not to say, however, that the territorial limitation of a state's laws limits its application of its own laws to an issue with which it has a substantial and legitimate interest. Given the multistate legislative interest, *American Banana* imposes no choice-of-laws mandate on the respective states, *Richards* v. *United States* (1962), 369 US 1 (82 S Ct 585, 7 L Ed 2d 492). Such choice-of-laws rules, within the limit of legitimate governmental interest in the matter, have been and remain a matter of internal policy of the respective states, *Richards, supra.*

We are left with the inescapable conclusion that *Kaiser* was not the result of independent analysis based on facts similar to those now before us. Nowhere in *Kaiser* is inquiry made as to why the law of the place of the wrong should invariably govern the standard of care owed by parties to a relationship based primarily in a state other than that in which the injury occurred. We conclude that a necessary ingredient of the *Kaiser* decision was that the application of *lex loci delicti* as to any and all issues relating to the right was the universally accepted rule in this country. What should the result be on a re-examination of *Kaiser* when the very essential fact of universality and predictability are no longer existent? It appears to our minds that

*Kaiser* governs a fact situation which no longer exists. Under the facts of the present case, including the jurisdictional facts which are necessarily part of any conflicts or choice-of-laws rule, our Supreme Court should write on a clean slate. No Michigan decision has decided the issue of choice-of-laws amid a family of sister sovereignties who have chosen to apply the law of the place of most significant relationship with the particular issue in question.

In *Reich* v. *Purcell* (1967), 67 Cal 2d 551, 555 (63 Cal Rptr 31, 432 P2d 727), the California court forthrightly rejected the *lex loci delicti* rule in favor of the more flexible and modern approach of most significant relationship. Justice Traynor, writing for the court, stated:

"As jurisdiction after jurisdiction had departed from the law of the place of the wrong as the controlling law in tort cases, regardless of the issue involved * * * that law no longer affords even a semblance of the general application that was once thought to be its great virtue. We conclude that the law of the place of the wrong is not necessarily the applicable law for all tort actions brought in the courts of this state."

We believe that *Kaiser* was predicated on this "general application" and that the reason having disappeared from the present case, that decision is simply no longer applicable. *Ratio est legis anima; mutata legis ratione mutatur et lex.*[5]

Indeed, the *lex loci delicti* formulation is no longer of general application. Nearly every jurisdiction[6]

---

[5] In mildest paraphrase, this maxim reflects the familiar principle that when the reason of the law is changed, the law is also changed. See, also, *Steger* v. *Blanchard* (1958), 353 Mich 140, 144.

[6] The only jurisdiction recently to have upheld the automatic application of *lex loci delicti* is Maryland, where the court of appeals considered the abandonment of the rule to be for the legislature. *White* v. *King* (1966), 244 Md 348 (223 A2d 763). Insofar as our research discloses, this approach is unique.

which has recently considered the choice-of-laws is-
sue in multistate torts has departed from the *lex loci
delicti* formulation as to applicable law. The pre-
cise language and rules adopted by these jurisdic-
tions vary in exact content but are unanimous in
seeking a rule of governing law which will do jus-
tice in a particular case and vindicate the state's
policy having the most significant relationship with
the particular issue of the case. *Reich* v. *Purcell,
supra;*[7] *Babcock* v. *Jackson* (1963), 12 NY2d 473
(240 NYS2d 743, 191 NE2d 279, 95 ALR2d 1);[8]
*Wartell* v. *Formusa* (1966), 34 Ill 2d 57 (213 NE2d
544); *Balts* v. *Balts* (1966), 273 Minn 419 (142 NW
2d 66);[9] *Clark* v. *Clark* (1966), 107 NH 351 (222 A
2d 205);[10] *Griffith* v. *United Air Lines, Inc.* (1964),
416 Pa 1 (203 A2d 796);[11] *Mellk* v. *Sarahson* (1967),
49 NJ 226 (229 A2d 625);[12] *Wilcox* v. *Wilcox* (1965),
26 Wis 2d 617 (133 NW2d 408); *Merchants National
Bank & Trust Co. of Fargo* v. *United States* (DC ND,
1967), 272 F Supp 409; *Casey* v. *Manson Construc-
tion & Engineering Company* (1967), 247 Or 274
(428 P2d 898); *Wessling* v. *Paris* (Ky, 1967), 417
SW2d 259; *Williams* v. *Rawlings Truck Line, Inc.*
(CA DC, 1965), 357 F2d 581.[13]

Concluding then, as we do, that every vestige of
reason for the *Kaiser* decision has been stripped

[7] In California, see, also, *Emery* v. *Emery* (1955), 45 Cal 2d 421
(289 P2d 218).

[8] Other New York decisions include *Dym* v. *Gordon* (1965), 16
NY2d 120 (262 NYS2d 463, 209 NE2d 792); *Macey* v. *Rozbicki*
(1966), 18 NY2d 289 (274 NYS2d 591, 221 NE2d 380).

[9] Following the now famous Minnesota case of *Schmidt* v. *Driscoll
Hotel, Inc.* (1957), 249 Minn 376 (82 NW2d 365). Another case
applying the law of the place of wrongful conduct is *Myers* v.
*Gaither* (DC App, 1967), 232 A2d 577.

[10] And *Dow* v. *Larrabee* (1966), 107 NH 70 (217 A2d 506).

[11] The *Griffith* decision is especially significant when viewed in
comparison with *Kilberg* v. *Northeast Airlines, Inc.* (1961), 9 NY
2d 34 (211 NYS2d 133, 172 NE2d 526).

[12] Also *Koplik* v. *C. P. Trucking Corporation* (1958), 27 NJ 1
(141 A2d 34).

[13] More recently, *Roscoe* v. *Roscoe* (CA DC, 1967), 379 F2d 94.

away, it now remains to decide which law should govern the issue of duty owed by a host-driver to his guest-passenger. More particularly, we must analyze the respective interests of Ontario, New York and Michigan in resolving this issue and which of those interests will be served by application of that jurisdiction's substantive rules.

The sole issue on this appeal is the duty attached to a legal relationship created and consummated in New York. We believe that State's law should govern the duties and liabilities imposed through that relationship. *Kaiser v. North, supra,* which we are obligated to follow, compels a contrary conclusion. But to our minds it would seem only logical not to subject a one-time legal relationship such as host and passenger to a multitude of legal incidents, unanticipated by the parties, solely by virtue of crossing states' lines.

*Babcock v. Jackson, supra,* is not explicit on this point. There, New York law was held to govern the issue of duty owed by a New York driver to a New York passenger who were involved in an automobile accident while passing through Ontario. The opinion talks both about the most significant relationship with the issue of duty owed, and a "grouping of contacts" approach to arriving at a choice of governing law. This has led to an uncertainty in the minds of some as to whether the test of *Babcock* is a qualitative appraisal of respective states' interests or a mechanical (quantitative) counting or grouping of relevant contacts. See comment, 52 Va L Rev 302. The later decision in *Dym v. Gordon* (1965), 16 NY2d 120 (262 NYS2d 463, 209 NE2d 792), would make it appear that New York will identify the most significant relationship in terms of a quantitative counting of the contacts. Thus in *Dym,* two New York residents met in Colorado and were traveling

in that State when the accident occurred. Although
Colorado had no more interest in the host-passenger
liability there than Ontario had in *Babcock,* Colorado
law was held to govern the liability issue apparently
because it had the greatest number of contacts.

There would appear to be a common thread run-
ning through these cases of great weight being placed
on the initial situs of the relationship whose legal in-
cidents are in issue, or the place where that rela-
tionship was created.

A similar comparison can be found in New Hamp-
shire. In *Dow* v. *Larrabee* (1966), 107 NH 70 (217
A2d 506), a New Hampshire resident went to Massa-
chusetts to pick up another New Hampshire resident
who had been staying in Massachusetts. On the
return trip the accident occurred while the parties
were still in Massachusetts. Although the New
Hampshire court was applying the most significant
interest formula, Massachusetts' law was held to
govern because it was there the guest-passenger re-
lation was created. In *Clark* v. *Clark, supra,* decided
later that year by the same court, two New Hamp-
shire residents were driving from one point in that
state to another when they passed through Vermont.
The accident occurred in Vermont, and the law of
that State required gross negligence for a guest-
passenger action. In *Clark,* however, the guest-
passenger relation arose in New Hampshire and that
State's law was held to govern.

The many cases dealing with the issue of intra-
familial liability have likewise been governed by
the law of the situs of the relationship, *Emery* v.
*Emery* (1955), 45 Cal 2d 421 (289 P2d 218) ; *War-
tell* v. *Formusa, supra; Balts* v. *Balts, supra; Koplik*
v. *C. P. Trucking Corporation* (1958), 27 NJ 1 (141
A2d 34). Although explained on the basis that the
domicile state has the most significant interest in

the family relationship (*Wartell, supra,* 34 Ill 2d .57, 59 [213 NE2d 544, 545]) it is not unlike other legal relationships which may exist within the state as well. The gist, we believe, aside from the somewhat exceptional nature of family law, is that the state in which the legal incidents of a relationship are primarily situate has the most significant interest in governing that relationship for choice-of-law purposes.

We believe this to be the better and more logical choice of law as to this issue of a host's duty to his guest. Defendant Farrell went into New York and there the guest-passenger relationships were formed. All parties could reasonably anticipate, on beginning the trip from Buffalo to Detroit, that New York's law might govern the rights incident to that relationship. We do not rest this decision on any pretense of a contract made in Buffalo relative to the carriage to Detroit. There was an agreement, however, by which defendant agreed to become a host-driver and his passengers agreed to ride with him. The agreement, and consequently the relationship, was born in New York and was a creature of New York law. If the parties had contemplated the governing law at the inception of their relationship, we can only say, in the absence of a contrary showing, that they would contemplate application of New York's rules. We cannot say that under such an arrangement these New York parties would have contemplated application of Ontario or even Michigan law to their relationship. One might imagine the surprise of a New York resident out for a ride over to Ontario where he now finds out that his driver is free to indulge in the most wanton misconduct without fear of liability.

Ontario has no genuine interest in whether a New York passenger can recover for the wrongful acts

of a Michigan host-driver, driving a Michigan vehicle. The policy behind the Ontario statute involved in this case was to prevent fraudulent and collusive suits against a gratuitous host's insurer. See *Babcock* v. *Jackson, supra,* citing article at 1 Toronto LJ 358 (1936); see, also, 67 Columbia L Rev 459. Ontario's policy will be neither served nor thwarted by the imposition of liability in this present case—a Canadian insurer not being involved. Ontario simply has no interest in the resolution of this issue and there is no good reason why its laws should serve such an ignoble purpose in this case.

Because we do not believe that Michigan has the most significant relationship with Farrell's responsibility to his passengers, we need not reach the question of whether this State would be free to apply its own substantive rules of liability. See *Home Insurance Co.* v. *Dick, supra.*

Ontario has the primary interest in the conduct taking place on the highways and roads within the province. It is generally accepted that as to the substantive wrong, *i.e.,* whether the conduct constituted negligence or gross negligence, the law of the place of the wrong governs. *Babcock* v. *Jackson, supra; Reich* v. *Purcell, supra; Williams* v. *Rawlings Truck Line, Inc., supra.* Ontario's interest in this aspect of the case is prime. The decisions of this State which have considered the question will support the application of Ontario law to determine whether the defendant Farrell's conduct was tortious.

*Kaiser* v. *North,* however empty a shell, remains for its destruction by its creating tribunal. We urge a fresh look at the dictates of *lex loci delicti* and are hopeful that plaintiff will so pursue his cause. In our desire to have this rule re-examined we share the expression of the late Judge Robert M. Toms,

when, in speaking of his duty to precedent, he stated (as quoted in *Detroit Edison Company* v. *Janosz* [1957], 350 Mich 606, 614):

" 'The court fervently hopes the petitioners in this case will appeal his decision and that it will be promptly and definitely reversed by the Supreme Court in which event the court will join a host of others in dancing in the streets.' "

Affirmed. Costs to appellees.

QUINN, J., concurred with J. H. GILLIS, J.

LEVIN, P. J. (*dissenting*). I agree with my brothers that the doctrine of *lex loci delicti* is obsolete. Our principal disagreement concerns our reviewing function. In my opinion, merely because the Michigan Supreme Court has not formally repudiated *lex loci* does not bind us to await its decision if we are convinced that were it passing on the question today the Supreme Court would adopt another approach to the choice-of-law problem.

1.

Judge GILLIS' opinion fully demonstrates that those courts which have felt themselves free to re-examine the question have repudiated *lex loci delicti*.

"No conflict of laws authority in America today agrees that the old rule should be retained. See, *e. g.*, texts and articles by Cavers, Ehrenzweig, Hancock, Leflar, Morris, Reese, Rheinstein, Trautman, Traynor, von Mehren and Weintraub, to mention only a few. No American court which has felt free to re-examine the matter thoroughly in the last decade has chosen to retain the old rule." *Clark* v. *Clark* (1966), 107 NH 351, 352 (222 A2d 205, 207).

I am convinced our Supreme Court, for the same compelling reasons that have influenced courts in

numerous jurisdictions to abandon *lex loci,* will reach the same conclusion when given an opportunity to do so.

I conceive it our duty to decide this case as we confidently believe the Supreme Court would decide it.[1]

---

[1] See *Spector Motor Service, Inc.* v. *Walsh* (CA2, 1943), 139 F2d 809, 814, remanded on other grounds *Spector Motor Service, Inc.* v. *McLaughlin* (1944), 323 US 101 (65 S Ct 152, 89 L Ed 101), where, speaking for a majority of the second circuit panel, Judge Clark wrote:

"If that were the whole story or if further our duty were limited to picking the closest unoverruled analogy in reported cases and following that blindly and mechanically, we should hold that these cases, and particularly the Alpha Cement case, had foreclosed all further discussion. But that is far from the whole story; the trends noted above have gone further in several specific cases fundamentally close to this and in divisions in the [United States Supreme] Court itself, which are certainly not without significance in forecasting the future course of the law. And our function cannot be limited to a mere blind adherence to precedent. *We must determine with the best exercise of our mental powers of which we are capable that law which in all probability will be applied to these litigants or to others similarly situated.* If this means the discovering and applying of a 'new doctrinal trend' in the Court, *Perkins* v. *Endicott Johnson Corp.* (CA2), 128 F2d 208, 217, 218, affirmed 317 US 501 (63 S Ct 339, 87 L ed 424), this is our task to be performed directly and straightforwardly, rather than 'artfully' dodged. The Attitude of Lower Courts to Changing Precedents, 50 Yale L J 1448, 1459. As was said recently with rare prescience by Judge Parker in the controversial issue as to the constitutionality of the required flag salute: 'Under such circumstances and believing, as we do, that the flag salute here required is violative of religious liberty when required of persons holding the religious views of plaintiffs, we feel that we would be recreant to our duty as judges, if through a blind following of a decision which the Supreme Court itself has thus impaired as an authority, we should deny protection to rights which we regard as among the most sacred of those protected by constitutional guaranties.' *Barnette* v. *West Virginia State Board of Education* (DC SD W Va), 47 F Supp 251, 253, affirmed 319 US 624 (63 S Ct 1178, 87 L ed 1628)." (Emphasis supplied.)

While disagreeing with the majority's prediction of how the United States Supreme Court would decide the case there presented, Judge Learned Hand in dissent nevertheless expressed his agreement with the foregoing quoted statement, when he said (p 823):

"It is always embarrassing for a lower court to say whether the time has come to disregard decisions of a higher court, not yet explicitly overruled, because they parallel others in which the higher court has expressed a contrary view. I agree that one should not

"We must determine with the best exercise of our mental powers of which we are capable that law which in all probability will be applied to these litigants or to others similarly situated. \* \* \*

wait for formal retraction in the face of changes plainly foreshadowed; the higher court may not entertain an appeal in the case before the lower court, or the parties may not choose to appeal. In either event the actual decision will be one which the judges do not believe to be that which the higher court would make. But nothing has yet appeared which satisfies me that the case at bar is of that kind; and, as I have said, I can see no good reason for making any distinction between one kind of federal activity and another. The way out is in quite another direction, and includes both. Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant; on the contrary I conceive that *the measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before it.*" (Emphasis supplied.)

See, also, *Putman* v. *Erie City Manufacturing Company* (CA5, 1964), 338 F2d 911, 921, 923, where Judge Wisdom wrote:

"The Erie problem this case presents is troublesome, but is not as troublesome as the problem that confronted the First Circuit in *Mason* v. *American Emery Wheel Works*, (CA1, 1957), 241 F2d 906. In that case the plaintiff, an employee of a subvendee of the defendant manufacturer, was injured when an emery wheel disintegrated. Mississippi law controlled. The supreme court of Mississippi had unequivocally held in *Ford Motor Co.* v. *Myers* (1928), 151 Miss 73 (117 So 362), and in a number of earlier cases, that privity was a prerequisite to recovery against a manufacturer. Nevertheless, basing its decision on a dictum in a later case and the evident trend in *other states* started by *MacPherson* v. *Buick Motor Co.* [(1916), 217 NY 382 (111 NE 1050, LRA 1916F 696, Ann Cas 1916C 440)], the court dispensed with the necessity of privity \* \* \*

"This Court has the same deference for the Texas supreme court that Judge Magruder had for the Mississippi supreme court in *Mason* v. *American Emery Wheel Works*. Echoing Judge Magruder [241 F2d 906, 909], we conclude that it would be 'gratuitous and unwarranted' to assume that the forward-looking supreme court of Texas, which in *Decker* [*Jacob E. Decker & Sons, Inc.*, v. *Capps* (1942), 139 Tex 609 (164 SW2d 828, 142 ALR 1479)] was one of the leaders in the assault on the citadel of privity, would now hold that privity is required in nonfood cases, 'when we bear in mind the readiness of *other courts*, in conservative jurisdictions at that, to overrule their earlier holdings and to bring their jurisprudence into accord with what is now the overwhelming weight of authority'." (Emphasis supplied.)

Similarly, see *Necaise* v. *Chrysler Corporation* (CA5, 1964), 335 F2d 562, 572, 573:

"The measure of [a lower court's] duty is to divine, as best it can, what would be the event of an appeal in the case before it." [Quotations from opinions of Judges Clark and Hand in *Spector Motor Service, Inc.*, v. *Walsh, supra,* footnote 1, pp 814, 823.]

---

"It is difficult for us to conclude that the supreme court of Mississippi would now hold that a *defective* automobile is not a dangerous instrumentality per se." (Emphasis supplied by the court.)

See, also, Judge Woodbury's dissenting opinion in *United States* v. *Girouard* (CA1, 1945), 149 F2d 760, reversed 328 US 61 (66 S Ct 826, 90 L Ed 1084); *Picard* v. *United Aircraft Corporation* (CA2, 1942), 128 F2d 632, 636; *S. C. Johnson & Son, Inc.* v. *Palmieri* (CA1, 1958), 260 F2d 88; *Maxfield* v. *Denver and R. G. W. R. Co.* (1958), 8 Utah 2d 183 (330 P2d 1018); *Watts* v. *Pioneer Corn Company, Inc.* (CA7, 1965), 343 F2d 617; *Gardella* v. *Chandler* (CA2, 1949), 172 F2d 402, 409, Judge Frank's opinion.

The reader will observe that the cases cited in this footnote can by and large be distinguished from the case at bar on the ground that the changes in controlling law dealt with in the cited cases either were foreshadowed by other opinions of the highest Court itself or concerned the law of another jurisdiction (*i.e.*, conflict of laws or Federal diversity cases), in which latter situations there was no way of obtaining the opinion of the Court with the final say on the decisional trends adopted in some of the cited cases. The noted distinction although valid, in my opinion weakens only the authority, not the persuasiveness of the analysis in the cited cases.

Compare opinion of Mr. Justice Frankfurter concurring in *Bernhardt* v. *Polygraphic Company of America* (1956), 350 US 198, 209, 210 (76 S Ct 273, 280, 100 L Ed 199):

"For the mere fact that Vermont in 1910 restated its old law against denying equitable relief for breach of a promise to arbitrate a contract made under such Vermont law, is hardly a conclusive ground for attributing to the Vermont Supreme Court application of this equitable doctrine in 1956 to a contract made in New York with explicit agreement by the parties that the law of New York which allows such a stay as was here sought, New York civil practice act, § 1451, should govern. *Cf. Brown* v. *Perry*, 104 Vt 66 (156 A 910, 77 ALR 1294). Law does change with times and circumstances, and not merely through legislative reforms. It is also to be noted that law is not restricted to what is found in Law Reports, or otherwise written. See *Nashville, C. & St. L. R. Co.* v. *Browning* (1940), 310 US 362, 369 (60 S Ct 968, 84 L ed 1254). The Supreme Court of Vermont last spoke on this matter in 1910. The doctrine that it referred to was not a peculiar indigenous Vermont rule. The attitude reflected by that decision nearly half a century ago was the current traditional judicial hostility against ousting courts, as the phrase ran, of their jurisdiction."

Likewise here. The Michigan Supreme Court did not invent *lex loci delicti.* It was adopted in Michigan, without consideration of

Dissenting Opinion by Levin, P. J.

We should, of course, be most circumspect in our analysis before concluding a previously declared rule of law would no longer be followed today. We may not properly intrude on the Supreme Court's function or subtly inject a personal view in attempted replacement of governing law. But where the evidence is overwhelming, as here, that a rule previously announced would no longer be followed, our duty to the litigants requires us to act on that conviction, acknowledging, as we do so, that we have been declared wrong before.

There are substantial reasons why we should not await a formal overruling declaration from our Supreme Court. The litigant whose cause is defeated by application of a rule of law predictably obsolete may not have the wherewithal to carry the struggle further. The Supreme Court may decline to grant leave to appeal for reasons unconnected with its view of the meritorious question.[2] I think it fairer to

_its desirability, because it represented the generally accepted rule of law for deciding choice of law questions in tort cases. It would have been unique to have then adopted any other rule, just as today it would be unique to continue to adhere to the old rule._

_To the extent Kaiser v. North (1939), 292 Mich 49, reflects a policy decision on the part of the Supreme Court to adopt the then prevalent conflict-of-laws rule, we would be applying that policy were we to adopt, as I would, the new approach to choice of law problems adopted by so many other jurisdictions._

_The fairly recent Michigan Supreme Court decisions reiterating the old rule can be explained by the failure of counsel to raise the question whether the old rule should continue to govern, which in turn may be explained by the fact nothing may have turned in those cases on selection of one law rather than another or uncertainty, as here, what law would be selected if the old rule were abandoned._

[2] "It is time to remind again, as Justice Holmes did for the Court in United States v. Carver (1923), 260 US 482, 490 (43 S Ct 181, 67 L ed 361) that 'The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times', and that this Court has formally adopted that reminder as expressive of its policy and attitude toward the effect of orders denying leave to appeal." _Frishett v. State Farm Mutual Automobile Insurance Company_ (1967), 378 Mich 733, approving our Court's reversal of a summary judgment. The per curiam opinion of the Supreme Court observed (see footnote 5)

the litigants in this case, and to those other litigants whose cases now may be pending in the trial courts of this State and in the Federal courts, governed in diversity cases by the rule of *Erie Railroad Company* v. *Tompkins* (1938), 304 US 64 (58 S Ct 817, 82 L Ed 1188, 114 ALR 1487), who look to the decisions of our Court as well as those of the Supreme Court of Michigan for guidance concerning governing law, to decide this case as we are convinced the Supreme Court of Michigan would decide it.[3]

---

that a trial "will provide a much better footing for determination of the posed question of law."

[3] Compare *Rodebaugh* v. *Grand Trunk W. R. Co.* (1966), 4 Mich App 559, limiting a rule of law enunciated a number of years ago by the Michigan Supreme Court.

See Comment: The attitude of Lower Courts to Changing Precedents, 50 Yale L J 1448 (1941).

A view differing with the one expressed in this opinion is ably presented in Kelman, The Force of Precedent in the Lower Courts, 14 Wayne L Rev 3, 10 (1967).

Trial and intermediate appellate court judges are daily engaged in announcing new rules of law, either because the question is new or thought to be new, or because they must choose among conflicting high court precedents, or because they discern a "distinction", all of which is perceptively recognized and well illustrated in Professor Kelman's article.

The trial judge's power to find the facts in cases tried without a jury, rule on evidentiary questions, control the course of proceedings, grant motions for a new trial, the sentencing power, etc., and our Court's power to grant or deny leave to appeal, have much greater impact on the law than will the relatively rare decision of a lower court tribunal stating forthrightly it is convinced, on the basis of substantial evidence, that a previously declared rule of law would no longer be followed by the Supreme Court.

No judicial action is more viable than a judge's ruling on a question of law, unlike decisions on the countless discretionary matters which in most cases have low viability, if any viability at all. Our Court sits in panels of 3, the agreement of 2 is required to take any action, and presumably all 3 judges would be in agreement, as all 3 of us are in this case on the meritorious question, if the evidence that the Supreme Court would no longer adhere to a previously declared rule of law is clear enough to warrant the degree of conviction on our part which alone would justify us in acting thereon. If the conviction on which we act is unjustified, the Supreme Court is not without remedy.

There need be little concern that lower court judges will proceed other than with great circumspection when addressing themselves

2.

Although convinced that the Michigan Supreme Court would not choose the law of Ontario (the *lex loci*), I think it far from clear it would necessarily apply New York law in preference to Michigan law. Even though the fatal journey commenced in New York, and thus, in a sense, the guest-passenger relationship was there created, to exalt that factor to the exclusion of all others would be to return to Professor Beale's vested rights approach to choice-of-law problems, substituting *lex loci relationis* or a kind of *lex loci contractus* for *lex loci delicti*. The cases that have abandoned *lex loci* emphasize the importance of examining all relevant factors, all significant contracts, not just one, in resolving choice-of-law problems.[4]

---

to a presented question of the continued viability of high court established precedent.

[4] See, *e.g.*, *Heath* v. *Zellmer* (1967), 35 Wis 2d 578 (151 NW2d 664), and *Zellinger* v. *State Sand & Gravel Co.* (1968), 38 Wis 2d 98 (156 NW2d 466).

*Kuchinic* v. *McCrory* (1966), 422 Pa 620 (222 A2d 897), held that Pennsylvania was the State "with the most significant interest in defining the legal consequences attached to the relationship." In reaching that decision the court mentioned, in addition to the fact the host-guest relationship was established in Pennsylvania, that the relationship was intended to terminate and the domicile of all 4 passengers was in Pennsylvania.

In *Heath* v. *Zellmer, supra*, the Wisconsin court selected its own law in preference to Indiana's, the latter being the State where the host-guest relationship was established. The court acknowledged that Indiana had substantial contacts; the trip both commenced and was expected to end in Indiana. The case is approvingly discussed in the law review article cited in footnote 15.

In *Macey* v. *Rozbicki* (1966), 18 NY2d 289 (274 NYS2d 591, 221 NE2d 380), the host-guest relationship was "created" in Ontario, yet Ontario's rule denying recovery was not applied in an action between relatives, all New Yorkers. Compare *Dym* v. *Gordon* (1965), 16 NY2d 120 (209 NE2d 792, 262 NYS2d 463).

Contrast: *Dow* v. *Larrabee* (1966), 107 NH 70 (217 A2d 506), but see *Clark* v. *Clark, supra*.

The proposed official draft of Restatement, Second, Conflicts of Law, would sum up the state of American law as follows:

"§ 145.   The General Principle.

"(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which,

Here, the relationship is not centered in either
Michigan or New York; the plaintiffs are domicili-
aries of New York, but the defendant driver and
the defendant corporate owner of the car are dom-
iciled in Michigan. Whether Michigan should choose
its own law in preference to New York's depends
on considerations inadequately covered by the sum-
mary judgment record on which this case comes to
us,[5] and not fully developed in the briefs.

─────────────────────────

as to that issue, has the most significant relationship to the occur-
rence and the parties under the principles stated in section 6.

"(2) Contracts to be taken into account in applying the prin-
ciples of section 6 to determine the law applicable to an issue
include:

"(a) the place where the injury occurred,

"(b) the place where the conduct causing the injury occurred,

"(c) the domicil, residence, nationality, place of incorporation
and place of business of the parties, and

"(d) the place where the relationship, if any, between the
parties is centered.

"These contacts are to be evaluated according to their relative
importance with respect to the particular issue." Restatement,
Second, Conflict of Laws, proposed official draft, Pt II.

"§ 6. Choice of Law Principles.

"(1) A court, subject to constitutional restrictions, will follow
a statutory directive of its own state on choice of law.

"(2) When there is no such directive, the factors relevant to the
choice of the applicable rule of law include

"(a) the needs of the interstate and international systems,

"(b) the relevant policies of the forum,

"(c) the relevant policies of other interested states and the
relative interests of those states in the determination of the
particular issue,

"(d) the protection of justified expectations,

"(e) the basic policies underlying the particular field of law,

"(f) certainty, predictability and uniformity of result, and

"(g) ease in the determination and application of the law to
be applied." Restatement, Second, Conflict of Laws, proposed
official draft, Pt I.

5 "Reversal of this summary judgment will doubtless bring about
a trial of plaintiff's allegations, the record of *which will provide a
much better footing for determination of the posed question of law.*
Summary judgment, for the reason assigned by defendant, should not
have been granted. Rather the question should have been reserved
for consideration on motion for peremptory instruction or directed
verdict." (Emphasis supplied.) *Frishett* v. *State Farm Mutual Auto-
mobile Insurance Company, supra.*

3.

There is no need to consider whether New York's law should be applied in preference to Michigan's until it is first determined that there is a difference between the laws of the two States. See Traynor, Is This Conflict Really Necessary?, 37 Tex L Rev 657 (1959). And we cannot determine whether there is a difference without first determining the law that each of the two States would apply in resolving this controversy.

In choosing New York's law in preference to Michigan's, the majority, of necessity, proceed on the supposition that there is a difference between the law of the two States—that Michigan law requires a guest passenger to prove gross negligence and New York law does not. That supposition, in turn, is based on the assumption that Michigan's owner liability statute and its guest-passenger amendment[6] operate extraterritorially.

At the times the owner liability statute was enacted (PA 1915, No 302, § 29 [CL 1915, § 4825]) and its guest-passenger amendment was added (PA 1929, No 19 [CL 1948, § 256.29 (Stat Ann § 9.1446)]), the universal rule was that all matters relating to a right of action for personal injury brought in one jurisdiction for a tort committed in another were governed by the law of the place of injury.[7] That

---

[6] CLS 1961, § 257.401 (Stat Ann 1960 Rev § 9.2101).

[7] 11 Am Jur, Conflict of Laws, § 182, p 490; Restatement, Conflicts of Law, § 378, et seq. Later, owners were sometimes held vicariously liable based on statutes other than that of the place of injury by characterizing the owner's actions outside the state of injury as consent to the application of whatever law it was sought to apply; these cases are discussed in Ehrenzweig, Part II, p 794, infra, footnote 11.

If Michigan's statute applied extraterritorially it must have so applied in 1915 and 1929. It is incongruous to say that the statute applies extraterritorially and also to say, because of Kaiser v. North (1939), 292 Mich 49, we must apply only the law of the place of injury.

being the conceptual setting at the time of enactment, it seems to me anomalous to interpret our owner liability statute and its guest passenger amendment as having extraterritorial effect, to impute to the legislature the intention to make the statute operate extraterritorially[8] even though, when enacted, all courts, including Michigan's,[9] applied the *lex loci,* and refused to apply any other law, common or statutory, in determining the standard of care owed a guest passenger.

---

*Kaiser* can be read as holding that the owner liability statute is not effective extraterritorially. See footnote on p 53 and the following (p 54): "Neither our constitutional laws nor our statutory laws are of extraterritorial force as applied to a case of this character."

[8] "Unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country enacting it. To the contrary, the presumption is that the statute is intended to have no extraterritorial effect, but to apply only within the territorial jurisdiction of the state or country enacting it, and it is generally so construed. An extraterritorial effect is not to be given statutes by implication. Accordingly, a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it." 50 Am Jur, Statutes, § 487, pp 510, 511.

In 1936 New York's Court of Appeals held its owner liability statute "has no extraterritorial effect." *Cherwien* v. *Geiter* (1936), 272 NY 165 (5 NE2d 185). In 1967, it overruled its earlier holding. *Farber* v. *Smolak* (1967), 20 NY2d 198 (229 NE2d 36). Thus, there is precedent for breathing extraterritoriality into our (at time of enactment) local statute, but, on principle as well as authority, New York's 1967 decision is not persuasive. The 1967 New York decision did not consider or attempt to explain how a statute construed to be without extraterritorial application at the time of enactment could be held to operate extraterritorially by the passage of time.

See, also, footnote 7. Compare *Kernan* v. *Webb* (1929), 50 RI 394 (148 A 186), and *Masci* v. *Young* (1932), 109 NJL 453 (162 A 623), affirmed *Young* v. *Masci* (1933), 289 US 253, 258 (53 S Ct 599, 77 L Ed 1158, 88 ALR 170), regarding vicarious liability of nonresidents when *lex loci delicti* was the universal rule. See, also, Restatement of the Law, Conflicts of Law, § 387, p 384(2), 11 Am Jur, Conflicts of Law, § 182, p 492, n 10, and 8 Am Jur 2d, Automobiles and Highway Traffic, § 601, p 153.

[9] See *Slayton* v. *Boesch* (1946), 315 Mich 1.

4.

If, as suggested by this opinion, Michigan's owner liability statute does not apply extraterritorially, then, in determining the Michigan law (the *lex fori*) applicable in a case not governed by the statute, it would be necessary to consider and decide as common-law questions both the extent of the owner's vicarious liability[10] and whether a different standard of care applies when the injured person is a guest passenger.[11] We might well conclude that our common law permits a guest passenger to recover from both a vicariously liable owner and the driver upon showing ordinary negligence. If that be the decision, then there would be no difference between the law of Michigan and New York and, thus, no need to make a choice of law on that issue,[12] once it is de-

---

[10] See 8 Am Jur 2d, Automobiles and Highway Traffic, §§ 571–594, pp 122–149.

See, also, Prosser, Law of Torts (3d ed), pp 494–499. Professor Prosser states Florida has gone further than any other jurisdiction in extending common law liability, making the owner liable for any negligent driving by another on the theory that an automobile is a "dangerous instrumentality." See, also, Harper and James, The Law of Torts, § 26.10, p 1394, commenting on both the Florida rule of law and an insurance aspect of the matter.

[11] 8 Am Jur 2d, Automobiles and Highway Traffic, § 469, pp 33, 34.

See, also, *Clark* v. *Clark, supra,* where the court observed: "No American state has newly adopted a guest statute for many years. Courts of states which did adopt them are today construing them much more narrowly, evidencing their dissatisfaction with them. Pedrick, Taken for a Ride: The Automobile Guest and Assumption of Risk, 22 La L Rev 90 (1961); Comment, The Ohio Guest Statute, 22 Ohio St L J 629 (1961). Though still on the books, they contradict the spirit of the times." 107 NH 351, 357 (222 A2d 205, 210). Similarly, see *Heath* v. *Zellmer, supra,* p 603.

Professor Ehrenzweig has collected and classified both the guest passenger and vicarious liability conflict of laws cases, and has suggested that (p 991) "*lex fori* supplemented by a test of reasonable insurability emerges as the rationally applicable law." See Ehrenzweig, Guest Statutes in the Conflict of Laws—Towards a Theory of Enterprise Liability under 'Foreseeable and Insurable Laws': I, 69 Yale L J 595 (1960); Ehrenzweig, Vicarious Liability in the Conflict of Laws—Toward a Theory of Enterprise Liability under 'Foreseeable and Insurable Laws': III, 69 Yale L J 978 (1960).

[12] However, a conflict of laws issue could arise in regard to the owner's vicarious liability. In *Farber* v. *Smolak, supra* (see foot-

cided Ontario's law (the law of the place of injury) does not control decision.

If Michigan's owner liability statute operates extraterritorially, there remains a substantial question whether we should not apply, in a suit in this forum against a Michigan driver and a Michigan owner, the policy expressed in Michigan's "extraterritorial statute." Their expectations and their insurer's expectations may be thought superior to New York's interest in protecting its guest passenger domiciliaries.[13] Courts which have adopted the substantial contacts

---

note 8), New York's Court of Appeals achieved the result it desired to reach, namely, the automobile owner should be held vicariously liable in respect to the outstate accident as under New York's owner liability statute, by overruling its earlier decision in *Cherwein* v. *Geiter, supra.* The same result could have been achieved by declaring that under the forum's common law (applicable to those cases governed by New York law but until *Farber* v. *Smolak* not governed by its owner liability statute) the owner was vicariously liable on common-law principles (see footnote 10, *supra*).

If, as appears to be the case (see law review articles cited in footnotes 14 and 15 and cases cited in footnote 11), the courts are seeking means of avoiding the operation of the guest statutes and retaining the owner's vicarious liability, it would be simpler in many cases to develop the forum's common law rather than to go around Robin Hood's barn, turning the matter into a choice-of-law question and reconstruing the owner liability and guest-passenger statutes, which, when enacted, could only have been concerned with intrastate accidents. The difficulty with making it a choice of law question is revealed by the cases where this has been done: The solution worked out in the first case frequently does not serve well as cases with different facets come to decision (see law review articles cited in footnotes 14 and 15).

The courts are making new law when they reconstrue their statutory law or choose a foreign law to achieve the desired result; they would become no more involved in the law-making process, and in a sense less so, were they simply to reformulate the common-law rules regarding the owner's vicarious liability and the standard of care owed a guest passenger as applied to outstate accidents so as to achieve the same results attained by "choosing" foreign law or by reinterpreting local and foreign statutes.

The approach suggested would not eliminate choice-of-law problems when a contact State's law is different than the forum's, but it would eliminate the impetus for reinterpretation of owner-liability and guest-passenger statutes passed long ago and it would eliminate the choice-of-law problem in those cases where the common law of the forum as so formulated is the same as the applicable law of all other contact States.

13 Compare *Heath* v. *Zellmer, supra,* 596, and *Zellinger* v. *State Sand & Gravel Co., supra.*

approach have held that the law of the forum presumptively applies until it has been shown that because of some special relationship or consideration the nonforum contacts have greater significance.[14]

The New Hampshire and Wisconsin supreme courts have declared that the forum should try to select the law which reaches the soundest result:

"We prefer to apply the better rule of law in conflicts cases just as is done in nonconflicts cases, when the choice is open to us. If the law of some other state is outmoded, an unrepealed remnant of a bygone age, 'a drag on the coattails of civilization,' (Freund, Chief Justice Stone and the Conflict of Laws, 59 Harv L Rev 1210, 1216 [1946]), we will try to see our way clear to apply our own law instead. If it is our own law that is obsolete or senseless (and it could be) we will try to apply the other state's law. Courts have always done this in conflicts cases, but have usually covered up what they have done by employing manipulative techniques such as characterization and renvoi." *Clark* v. *Clark* (1966), 107 NH 351, 355 (222 A 205, 209).

Accord: *Heath* v. *Zellmer* (1967), 35 Wis 2d 578 (151 NW2d 664, 673).

A commentator recently suggested that the effort to achieve the result attainable under the "better

---

[14] *Wilcox* v. *Wilcox* (1965), 26 Wis 2d 617 (133 NW2d 408); *Kell* v. *Henderson* (1966), 26 App Div 2d 595 (270 NYS2d 552), holding that New York's law rather than Ontario's governs a lawsuit between persons who were residents and domiciliaries of Ontario arising out of a New York accident (discussed by Rosenberg, Two Views on Kell v. Henderson: An Opinion for the New York Court of Appeals, 67 Colum L Rev 459 (1967), and by Trautman, A Comment, 67 Colum L Rev 465 (1967), and in article cited in footnote 15, *infra*). See, also, footnote 4, Traynor, *op cit*, p 674, and Ehrenzweig, *op cit.*

Compare *Reich* v. *Purcell* (1967), 67 Cal 2d 551 (63 Cal Rptr 31, 432 P2d 727), a wrongful death action, choosing Ohio law (residence of decedents and survivors) over Missouri (place of injury) and California (forum and defendant's residence); similarly, see *Tramontana* v. *S. A. Empresa De Viacao Aerea Rio Grandense* (CA DC, 1965), 350 F2d 468.

law" explains some of the conflict found in the host-guest conflict cases.[15] Perhaps that is what we should try to accomplish in this case, but on the present summary judgment record I see neither need for decision nor basis for an informed decision thereon.

[15] See footnote 12. See, also, Ehrenzweig, Foreign Guest Statute and Forum Accidents: Against the Desperanto of State "Interests", 68 Colum L Rev 49, 54 (1968).